Stagg, Terenzi, Confusione & Wabnik, LLP
*Attorneys for Plaintiff*
*County of Suffolk*
401 Franklin Avenue, Suite 300
Garden City, New York 11530
(516) 812-4500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

COUNTY OF SUFFOLK,                                  Civ. No. 19-cv-906

                  Plaintiff,                     **COMPLAINT**

       -against-

UNITED STATES OF AMERICA,

                Defendant.
----------------------------------------------------------------X

     Plaintiff County of Suffolk (the "County"), for its Complaint, states and alleges as follows:

## NATURE OF THE CASE

     1.    This is a civil action arising under the laws of the United States of America, including the Resource Conservation and Recovery Act ("RCRA"), the Clean Water Act ("CWA") and the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the Federal Torts Claim Act, 28 U.S.C. § 1346, the laws of the State of New York, including the New York Environmental Conservation Law ("ECL") and common law, seeking declaratory relief, cost recovery, injunctive relief, damages and attorneys' fees and costs for the defendant's intentional, reckless or negligent contamination of the navigable waterways, groundwater, drinking water and surrounding land within the County which has caused and will continue to cause permanent and severe injury to County-owned land

located at the Francis S. Gabreski Airport in Westhampton, New York and all lands and waters downgradient thereto (the "Affected Property").

2.     The County also seeks to recover the necessary costs of response incurred consistent with the National Contingency Plan, 40 C.F.R. Part 300, caused by the release or threatened released of hazardous substances at the County's property.

3.     For the last forty years, the United States military, through the United States Air Force and Air National Guard ("National Guard"), has operated a base on the County's property and caused discharges, releases, spills and/or disposals of solid or hazardous waste materials, which have contaminated the County's property and other property and water and present an imminent and substantial endangerment to health and/or the environment.

4.     The contamination was caused by the military's negligent, intentional, reckless, willful, wrongful and/or illegal, non-discretionary acts and/or omissions at the County's property.

5.     The County has commenced remediation measures to combat the contamination, but the United States is liable for compensatory and consequential damages to reimburse the County for the costs and expenses it has incurred and will continue to incur.

6.     The County also seeks an injunction pursuant to the RCRA requiring the United States to immediately investigate and remediate the County's property; set treatment standards to the lowest detectable levels for the contaminants; halt all use of the contaminants on the property and install a filtration system such as a Granular Activated Carbon filter ("GAC") or other appropriate treatment or response system in the County's water supply; and pay for all costs related to the continued use of alternative water supplies until the contaminant is removed completely, and for operation and maintenance of a GAC in perpetuity until the remediation of

the County's water supply occurs and is completed.

7.     The County is also seeking a declaratory judgment pursuant to CERCLA that the United States is a responsible person that must reimburse the County for its past necessary response costs and all future necessary responses costs it has and will incur consistent with the National Contingency Plan and/or laws of the State of New York.

8.     Finally, the County is seeking indemnification from the United States in connection with certain legal actions commenced by individuals currently or formerly residing in the County arising out of the contamination.

## PARTIES

9.     The County is a municipality located in the State of New York with offices at H. Less Dennison Building, 100 Veterans Memorial Highway, P.O. Box 6100, Hauppauge, New York 11788.

10.     Defendant United States maintains offices at the offices of the President of the United States at the White House, 1600 Pennsylvania Avenue, Washington, D.C.

11.     Defendant United States, which acting through various departments, agencies and instrumentalities, including the Department of Defense, operated or controlled a base on the County's property in Westhampton, New York, in Suffolk County, and arranged for or exercised control over the disposal or treatment of hazardous substances at the property.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this case arises under the laws of the United States of America.

13.     This Court has jurisdiction over the subject matter of the First Cause of Action pursuant to RCRA, 42 U.S.C. § 6901, *et seq.*

14.     This Court has jurisdiction over the subject matter of the Second Cause of Action pursuant to CWA, 33 U.S.C. § 1251 *et seq.*

15.     This Court has jurisdiction over the subject matter of the Third through Sixth Causes of Action pursuant to § 113(b) of CERCLA, 42 U.S.C. §§ 9613(b), 9620; the Declaratory Judgment Act, 28 U.S.C. § 2201; and 28 U.S.C. § 1331.

16.     This Court has jurisdiction over the subject matter of the Seventh Cause of Action pursuant to Articles 27 and 37 of the ECL.

17.     This Court has jurisdiction over the subject matter of the Eighth through Twelfth Causes of Action pursuant to the Federal Torts Claims Act, 28 U.S.C. § 1346.

18.     This Court has supplemental jurisdiction over the remaining causes of action under 28 U.S.C. § 1367 because these claims are so related to the federal claims in this action that they form the same case and controversy under Article III of the United States Constitution.

19.     Venue is proper in this Court pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), RCRA § 7002, 42 U.S.C. § 6972(a), CWA § 505, 22 U.S.C. § 1365(a) and 28 U.S.C. § 1391(b) because the actual and threatened endangerments, releases, injuries, and damages at issue are taking place and have taken place in this district.

## FACTUAL STATEMENT

***The Francis S. Gabreski Airport and Air National Guard Base***

20.     In or around 1941, the United States Army developed an airfield in Westhampton Beach, New York to use for gunnery training in World War II.

21.     Following the war, a private oil company leased the airfield from the Army from 1948 to 1951.

22.     In 1951, the United States Air Force reactivated the airfield as the Suffolk County

Air Force Base, which remained active until 1969.

23.    In or around 1969, the County began operating the airfield as the Suffolk County Airport ("the Airport").

24.    In or around June 1970, the United States opened a base (the "Base") at the airport for air refueling, fighter-inception missions and aerospace rescue and recovery.

25.    The Airport is now known as the Francis S. Gabreski Airport and is owned by the County.

26.    The Airport is located on Old Riverhead Road, approximately two miles north of the Atlantic Ocean.  It is bounded to the north by undeveloped land, to the east by the Quogue Wildlife Refuge (the "Refuge"), to the south by the Long Island Railroad and to the west by Old Riverhead Road.

27.    The Base is located on 88.5 acres of land on the southwest side of the Airport that the County leased to the United States Air Force in 1969, and the lease is still in effect.

28.     The Base consists of runaways, hangars and maintenance/service facilities (the Base and Airport are collectively referred to herein as the "Airport Property").

*Surrounding Water Sources*

29.    Long Island sits on a sole source aquifer, which supplies local drinking water to millions of residents.

30.    Groundwater under the Airport Property flows toward the south-southeast. Depths to groundwater average between thirty-five and forty feet below ground surface.  The water flows towards the Aspatuck River and the Refuge, wherein the Quantuck Creek flows into the Old Ice Pond.

31.    From the Aspatuck River and Old Ice Pond, water makes its way into Quantuck

Bay and then into the Quantuck Canal.

32.    The Quantuck Canal flows south-southwest to Westhampton Beach and Moriches Bay and south-southeast into Shinnecock Bay.

33.    Both Moriches Bay and Shinnecock Bay have outlets into the Atlantic Ocean.

34.    These waterways are collectively referred to as the County Water Sources.

*Use of AFFF at the Airport and Base*

35.    Aqueous film forming foams ("AFFF") are Class B fire-fighting synthetic foams that were developed to suppress flammable liquid fires that cannot be extinguished with water alone.

36.    A concentrated form of AFFF, containing poly- and per-fluoroalkyl substances ("PFAS"), when mixed with water, forms a foam that coats the fire, blocking the supply of oxygen feeding the fire, creates a cooling effect and evaporation barrier to extinguish the vapors on fire, and smothers the fire after the foam has dissipated.

37.    Due to AFFF's specialized nature, the Department of Defense, and specifically the Air Force, have used AFFF to extinguish fuel-based fires during routine military drills.

38.    Since the inception of the Base, the United States Air Force has stored and utilized AFFF during fire fighting training exercises at the Base.

39.    During these training exercises, United States Air Force personnel sprayed AFFF containing PFAS on or near the ground, caused it to be disposed of in drains, and spilled it or otherwise caused it to discharge into the environment.

40.    Additional discharges may also have occurred in connection with automatic fire suppression systems, storage and handling of AFFF, or otherwise.  These activities resulted in discharges of PFAS into public and private drinking water sources in the area.

*Background of PFAS and Threats Posed to Public Health and Environment*

41.     PFAS are a group of organic fluorinated alkanes used for decades to produce household and commercial products that are heat resistant, stain resistant, long lasting and water and oil repellant.

42.     The two most widely studied PFAS are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA)," (collectively referred to herein as the "Hazardous Substances").

43.     The Hazardous Substances are found in AFFF.

44.     PFOS and PFOA have unique properties that cause them to be: (i) mobile and persistent, meaning that they rapidly spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.  Because of these properties, both PFOA and PFOS pose a significant threat to public health and to the environment.

45.     Mobility and persistence in the environment.  PFOA and PFOS easily dissolve in water, and thus they are mobile and readily spread in the environment.  PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

46.     PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable.  As a result, PFOA and PFOS are thermally, chemically, and biologically stable and they resist degradation due to light, water and biological processes.

47.     <u>Bioaccumulation and biomagnifications in the environment</u>.  Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion.  Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

48.     PFOA and PFOS bioaccumulate/biomagnify in numerous ways.  First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time.  Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present.  In humans, PFOA and PFOS remain in the body for years.

49.     Second, in humans and other mammals, PFOA and PFOS can bioaccumulate by crossing the placenta from mother to fetus and by passing to infants through breast milk.

50.     Third, they biomagnify up the food chain, such as when humans eat fish that have ingested PFOA and PFOS.

51.     <u>Toxic effects in humans and animals</u>.  Exposure to PFOA and PFOS is toxic and poses serious health risks to humans and animals. Human health effects associated with PFOA exposure include kidney and testicular cancer, thyroid disease, high cholesterol, ulcerative colitis, liver damage, and pregnancy-induced hypertension (also known as preeclampsia). Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol.  In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas and immune system.

***Early Knowledge of AFFF's Dangers***

52.     Since the 1970s, the primary manufacturer of AFFF has been The 3M Company

f/k/a Minnesota Mining and Manufacturing Co. ("3M").

53. The dangers of PFAS and their adverse effects on animals have been studied by 3M scientists since that time.

54. Between 1975 and 1976, a study was conducted on 3M's employees, in which the levels of PFAS in the employees' bloodstreams were one hundred times the expected levels.

55. Upon information and belief, the author of a related study contacted 3M about his findings, but 3M told him/her to downplay the results and that such exposure may not have been caused by 3M's products.

56. In 1981, 3M researchers found that ingestion of PFOA caused birth defects in rats, but failed to publish these findings or warn others of the dangers.

57. In or around 1993, a 3M sponsored study on goats indicated that PFOS was transferred via the mother's milk, but 3M failed to disclose this until 2005.

58. In or around 1998, 3M notified the EPA about PFOS detections in blood, but a follow up study and its results were not released until 2003. According to an internal memo from a 3M scientist, the company had been stalling on collecting data for over twenty years and warned workers not to document any of their findings or correspond in writing to their colleagues.

59. In 2000, the EPA received a study detailing the deaths of monkeys exposed to low levels of PFOS.

60. Upon information and belief, the Department of Defense knew about the dangers of AFFF by 2001.

61. Notwithstanding, the Department of Defense continued to use AFFF at the Base, but failed to alert the EPA or the County, about AFFF's dangers.

*History of PFAS Litigation*

62.     In or around June 1999, a West Virginian farmer commenced an action against E. I. DuPont De Nemours ("DuPont") arising out of the disposal of PFOA onto his land, which caused his cattle to become ill and die.  This action is generally understood to be the first litigation involving PFAS.

63.     In or around August 2001, a related class action was commenced against DuPont arising out of PFAS.

64.     In or around 2005, as part of a settlement of the class action, the parties agreed to create a panel of the leading scientists in the field of PFAS studies, known as the C-8 Science Panel (the "C-8 Panel"), to determine whether there was a link between PFOA and certain diseases.  The parties agreed that upon a determination by the C-8 Panel that there was a "probable link" between PFOA and a disease, an individual suffering from such disease could bring a personal injury action.

65.     The C-8 Panel linked six diseases to PFOA exposure, including kidney and testicular cancer, thyroid disease and ulcerative colitis, leading to over 3,500 legal cases being commenced in the West Virginia/Southern Ohio region.  These actions were subsequently transferred to the Southern District of Ohio by the Judicial Panel for Multidistrict Litigation. While some of these cases have gone to trial, it is believed that the remaining actions are being settled.

66.     Due in part to this litigation and pressure from the EPA, between 2000 and 2002, 3M voluntarily phased out PFOS from production in the United States.

*Subsequent Knowledge of PFAS Dangers*

10

67.    In 2006, the EPA and eight major PFOA manufacturers committed to working toward the elimination of their production and use of PFOA, and chemicals that degrade to PFOA, from emissions and products by the end of 2015.

68.    In 2009, the EPA published provisional health advisories ("PHA") for PFOA and PFOS; 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS.

69.    The EPA's health advisories were based on peer-reviewed studies of the effects of PFAS on animals and also informed by epidemiological studies of human populations exposed to PFAS.

70.    In 2012, the EPA included PFOA and PFOS among the list of contaminants that water systems are required to monitor under the third Unregulated Contaminant Monitoring Rule (UCMR 3).  This was initiated to determine the need for a national primary drinking water regulation.

71.    In 2015, PFOA was included in the EPA's proposed Toxic Substance Control Act's Significant New Use Rule ("SNUR"), which required the EPA to approve any efforts to reintroduce PFOA into the marketplace.

72.    In 2016, the EPA updated its Health Advisory Levels ("HALs") to reduce the acceptable levels of PFOS and PFOA to 70 ppt.

***Contamination at the Base***

73.    In response to the EPA's UCMR 3, an independent water authority located in the County, the Suffolk County Water Authority (the "Water Authority") began testing for PFAS.

74.    In or around October 2014, the first detection of PFOS above the EPA's PHA was found at the Base in a wellfield known as the Gus Guerrera Wellfield.  The Water Authority voluntarily removed this well from use.

75.     Upon information and belief, in response to this detection, the Water Authority retained a private company to conduct a preliminary assessment of the Base to identify areas of concern where AFFF was released during fire training activities.  The assessment identified eighteen areas of concern, sixteen of which were recommended to need further investigation.

76.     Over the next two years, numerous wells near the Base and the surrounding area with PFAS detections were shut down to prevent further contamination.

77.     In or around July 2016, the New York State Department of Environmental Conservation ("NYS DEC") sampled the groundwater and soil at the Airport Property and confirmed that the Base is the primary source of PFOA and PFOS contamination.

78.     On or about July 12, 2016, the NYS DEC notified the County that the Base was considered a potential inactive hazardous waste disposal site and that the National Guard Bureau would undertake a site investigation at the Base and reimburse the County for its costs.

79.     The NYS DEC also noted that if the Base is determined to be a Class 2 inactive hazardous waste disposal site, the National Guard Bureau would undertake a full Remedial Investigation/Feasibility Study and appropriate remediation.

80.     On July 22, 2016, the County issued a press release entitled "Water Quality Advisory for Private-Well Owners in the Areas of Westhampton."  The press release announced the detection of PFAS in public and private wells and that the County would conduct a private well survey in the vicinity of the Airport Property.

81.     In addition, the County advised private well users that the County was providing free bottled water as an alternative water supply to ensure that water quality meets health criteria.

82.     In August 2016, the Water Authority provided the National Guard Bureau with an updated report on the contamination and requested that the National Guard Bureau remediate the

Affected Property.

83.     In response, the National Guard Bureau, in a letter to the County, acknowledged that the release of PFAS from the Base contributed to the contamination of the County's land.

84.     The National Guard Bureau also noted that it, and the United States Air Force, would work with the County to "ensure safe, alternative drinking water is provided to private well owners and customers of the [Suffolk Water Authority]."

85.     On September 12, 2016, the NYS DEC notified the County that the Base was included in the Registry of Inactive Hazardous Waste Disposal Sites in New York State and that the NYS DEC had issued a demand to the Air National Guard to investigate the contamination and take full remedial measures, including the extension of public water lines to impacted and potentially impacted drinking water wells downgradient of the Base.

86.     On February 1, 2017, the NYS DEC adopted amendments to the Chemical Bulk Storage Regulations, 6 N.Y.C.R.R. Part 597, to add certain PFAS chemicals to the list of hazardous substances.

87.     Upon information and belief, the Airport Property, County Water Sources and the immediate surrounding area are contaminated with PFAS.

*Government's Failure to Reimburse County for Remediation*

88.     On or about August 24, 2016, the County and Water Authority met with the National Guard Bureau to discuss remedial efforts at the Airport Property and surrounding vicinity.

89.     On or about September 12, 2016, the NYS DEC notified the National Guard Bureau that the Base was designated as a Superfund site and that the National Guard Bureau was responsible for reimbursing the County for all remedial efforts, including but not limited to

connecting a public water line to all structures with private drinking water wells, regardless of whether the wells currently show detectable levels of contamination.

90.     On or about September 14, 2016, the County sent the National Guard Bureau a letter to discuss the need for the connection of public water lines to structures downgradient of the Airport Property.

91.     Negotiations ensued and in or around October 2016, the Air Force sent a draft cooperation agreement to the County.

92.     In or around November 2016, the County and Water Authority began to connect private well owners to a public water supply.  The NYS DEC agreed to reimburse the County for costs associated with 57 homes threatened by contamination, and the United States Department of Defense agreed to reimburse the County for costs associated with nine homes with private well contamination.

93.     On or about March 13, 2017, the Department of the Air Force issued a memorandum that all negotiations involving the cooperation agreement would cease.

94.     Notwithstanding, the County and Water Authority continued to connect property with private wells to a public water supply, incurring thousands of dollars in costs and expenses.

95.     In or around December 2017, the County sent a letter to the National Guard Bureau, urging it to move forward with the investigation and remediation of the Airport Property and surrounding vicinity.

96.     The National Guard Bureau did not respond.

*Affected Persons Litigation Against the County*

97.     On or about March 27, 2017, former and current residents of the Affected Property filed a potential class action entitled *Isaac Green et al. v. The 3M Company et al.*, Index

No. 605497/2017 ("*Green v. 3M*"), in part against the County due to the PFAS contamination at the Base and surrounding area. The plaintiffs alleged that the County was partly responsible for the contamination due to its ownership of the Airport Property.

98.     On or about December 11, 2017, another action entitled *Barbara Ayo et. al. v. The 3M Company et. al.*, Index No. 623698/2017 ("*Ayo v. 3M*", and together with *Green v. 3M*, the "Affected Persons Actions"), was commenced in part against the County due to the PFAS contamination at the Base and surrounding area. Similar to the class action allegations, the individual plaintiffs in *Ayo v. 3M* alleged that they suffered personal injuries from exposure to the PFAS detected in the County Water Sources.

99.     The Affected Persons Actions were removed to the United States District Court, Eastern District of New York.

100.     On December 7, 2018, the Judicial Panel for Multidistrict Litigation centralized the Affected Persons Actions with more than seventy-five AFFF based cases, to the United States District Court, District of South Carolina, for pre-trial proceedings.

*County's Notice of Claim Against Federal Government*

101.     On or about January 18, 2018, the County served a Claim for Damage, Injury or Death on the United States Department of Defense, National Guard Bureau, United States Air Force, the Administrator of the EPA and the Regional Administrator of the EPA, notifying these agencies of the County's claims arising from the contamination of the Airport Property and surrounding vicinity, including but not limited to the County Water Sources (the "Notice of Claim").

102.     The Notice of Claim included a claim for damages in the amount of $288,350.50 and reserved its right to seek additional damages incurred in connection with remediation of the

contamination.

103.    On February 1, 2018, the Department of the Air Force acknowledged receipt of the Notice of Claim, but requested additional information relating to the County's claim.

104.    On May 21, 2018, the County provided the information sought by the Department of the Air Force, including a more detailed description of the admission by the National Guard Bureau that the release of PFAS at the Base caused the contamination.

105.    That same day, the Department of the Air Force denied the County's claim.

106.    On August 17, 2018, the EPA sent the County a letter denying the County's claim.

## FIRST CAUSE OF ACTION
### (Violation of the Resource Conservation and Recovery Act)

107.    The County repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

108.    The contamination of the Airport Property and the County Water Sources described above presents an imminent and substantial endangerment to human health and environment.

109.    The United States had notice of the endangerment no later than August 2016, when the Airport Property was listed as a State Superfund Site, pursuant to Article 27 of the ECL.

110.    The United States may have had notice of the endangerment as early as 2001.

111.    The citizen suit provision of the RCRA allows any "person" to commence an action "against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the Eleventh Amendment to the Constitution, and including any past or present generator, past or present transporter, or past or

16

present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. . . ." 42 U.S.C. § 6972(a)(1)(B).

112.    Pursuant to 42 U.S.C. § 6903 (15), the County is a "person" entitled to bring suit under the RCRA.

113.    Pursuant to 42 U.S.C. § 6903 (15), the United States is "person" and subject to the citizen suit provisions of the RCRA, 42 U.S.C. § 6972.

114.    The Hazardous Substances on the Airport Property and the County Water Sources, including but not limited to PFAS, are "solid wastes," as defined in 42 U.S.C. § 6903(27), because they were discarded material resulting from operations at the Airport and/or Base, and resulted in the contamination of the waters and sediments of the County Water Sources.

115.    The Hazardous Substances, including but not limited to PFAS, are "hazardous wastes," as defined in 42 U.S.C. § 6903(5), because, as described above, they "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness" and "pose a substantial present or potential hazard to human health or the environment" because they have been "improperly treated, stored, transported, or disposed of, or otherwise managed."

116.    The United States has jurisdiction over the Base and is engaged in "activity resulting . . . in the disposal or management of solid waste or hazardous waste" at the Base, and is therefore required to comply with the requirements of the RCRA, pursuant to 42 U.S.C. § 6961.

117.    As described above, the United States is a "past or present generator, past or present transporter, or past or present owner of operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste," 42 U.S.C. § 6972(a), which resulted in the contamination of the Airport Property and County Water Sources.

118.    This contamination presents or may present an imminent and substantial endangerment to health or the environment, including a continuing threat to the health of County residents and users of the County Water Sources, and to the environment, including the Airport Property and County Water Sources.

119.    This Court should therefore issue an injunction, pursuant to 42 U.S.C. § 6972(a), requiring that the United States immediately investigate and remediate the Affected Property; set treatment standards to the lowest detectable levels for PFAS; halt all use of PFAS on the Airport Property and install a GAC or other treatment or response system to filter the County Water Sources; and pay for all costs related to the continued use of alternative water supplies until the PFAS removal and remediation is completed, and for operation and maintenance of a GAC or other treatment of response system in perpetuity until the remediation of the Affected Property occurs and is completed.

120.    This Court should also award the County the costs of this litigation, including reasonable attorney and expert witness fees, pursuant to 42 U.S.C. § 6972(e).

## SECOND CAUSE OF ACTION
### (Violation of the Clean Water Act)

121.    The County repeats and realleges the preceding paragraphs as though fully set forth herein.

18

122.  The CWA generally prohibits the discharge of pollutants, except in compliance with its terms. 33 U.S.C. § 1311(a).

123.  The term "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

124.  The citizen suit provision of the CWA, 33 U.S.C. § 1365(a)(1), allows "any citizen" to commence an action against "any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."

125.  The County is a "citizen," as defined in 33 U.S.C. § 1365(g), because it has interests that are adversely affected by the discharge of the Hazardous Substances.

126.  The United States is a "person," as defined in 33 U.S.C. § 1362(5).

127.  The Hazardous Substances are "pollutants," as defined in 33 U.S.C. § 1362(6).

128.  The County Water Sources are "navigable water[s]," as defined by 33 U.S.C. § 1362(7), because they are waters of the United States as defined in 33 C.F.R. § 328.3.

129.  The Base is a "point source" as defined by 33 U.S.C. § 1362(14).

130.  The County Water Sources are "navigable waters," as defined by the CWA.

131.  The United States lacks a National Pollutant Discharge Elimination System permit.

132.  The operations of the United States have been and are causing or contributing to the contamination of the County Water Sources in excess of the effluent standard of permissible PFOA and PFOS set forth by the EPA.

19

133.    The contamination is either still occurring now, or is likely to reoccur in the future.

134.    As a result, the United States is and continues to be in violation of the Clean Water Act.

135.    The United States has jurisdiction over the Base and is engaged in "activity resulting, or which may result, in the discharge or runoff of pollutants" at the Base, and are therefore required to comply with the requirements of the CWA, pursuant to 33 U.S.C. § 1323.

136.    This Court should issue an injunction, pursuant to 33 U.S.C. § 1365(a), requiring the United States to discontinue discharges of the Hazardous Substances in violation of the CWA, and to immediately investigate and remediate the sediment and waters of the County Water Sources.

137.    This Court should also award the County the costs of this litigation, including reasonable attorneys' and expert witness fees, pursuant to 33 U.S.C. § 1365(d).

**THIRD CAUSE OF ACTION**
**(Cost Recovery Under CERCLA § 107(a) – Declaratory Judgment for Operator Liability)**

138.    The County repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

139.    The County currently owns the Airport Property.

140.    CERCLA § 107(a)(1)-(4)(B) creates a private right of action for "any . . . person" to recover "necessary costs of response" incurred "consistent with the national contingency plan," plus interest. 42 U.S.C. § 9607(a)(1)-(4)(B).

141.    These costs may be recovered from any entity that falls within one of four categories of parties deemed liable by Congress when a release or threatened release from a facility of a hazardous substance causes the incurrence of response costs.   42 U.S.C. §

9607(a)(1)-(4)(B).

142.     The four categories of parties that Congress deemed liable for cleanup costs under CERCLA include: (i) owners and operators of facilities from which there was a release; (ii) person who owned or operated such facilities at the time hazardous substances were disposed of; (iii) persons "who by contract, agreement, or otherwise arranged" for disposal, treatment, or transport of hazardous substances; and (iv) transporters who selected disposal or treatment sites. CERCLA § 107(a)(1)-(4), 42 U.S.C. § 9607(a)(1)-(4).

143.     CERCLA § 101(22) defines the term "release" as any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substances . . .) . . ."42 U.S.C. § 9601(22).

144.     Disposal, releases and threatened releases of hazardous substances at or from the Airport Property, including the Hazardous Substances, have caused, and will continue to cause, the County to incur necessary costs of response that are consistent with the NCP.

145.     The Hazardous Substances disposed of and contained at the Airport Property have been "released" within the meaning of CERCLA § 101(22), 42 U.S.C. § 9601(22).

146.     The Airport Property is a "facility" within the meaning of CERCLA § 101(9) because it is a site "where a hazardous substance has . . . come to be located." 42 U.S.C. § 9601(9).

147.     The PFAS that contaminated the Affected Property are "hazardous substances" under CERCLA, 42 U.S.C. § 9601(14).

148.     The definition of "hazardous substances" under 42 U.S.C. § 9601(14) of CERCLA includes "hazardous wastes" having the characteristics identified under Section 3001

of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

149.    The PFAS that contaminated the Affected Property are "hazardous wastes" under Section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

150.    Specifically, the PFAS are hazardous wastes having one or more of the characteristics of persistence, bioaccumulation, biomagnification, ignitability, corrosivity and toxicity, as those characteristics are defined under Section 3001 of the Solid Waste Disposal Act, 42 U.S.C. § 6921.

151.    Moreover, New York State has listed PFAS chemicals as hazardous substances, 6 N.Y.C.R.R. Part 597.

152.    Under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), persons who operated a facility at the time of disposal of hazardous substances are liable for necessary costs of responding to a release or a threatened release of hazardous substances incurred by another person consistent with the NCP.

153.    The United States is liable under CERCLA as a person who owned or operated the Airport Property at the time of processing, release, or disposal of hazardous substances at the Airport Property and benefitted from such processing, release or disposal.

154.    The Declaratory Judgment Act, 28 U.S.C. § 2201, provides, in relevant part, that:

> In a case of actual controversy within its jurisdiction . . . any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

155.    An actual controversy exists among the parties stemming from the cost of remediating the Airport Property and the defendants' failure to do so.

156.    The County is therefore entitled to, and requests, a declaratory judgment that the United States is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), 9620(a)(4) for all response costs actually incurred by the County with respect to the Airport Property and County Water Sources.

157.    The County is also entitled to a declaratory judgment that the United States is liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

## FOURTH CAUSE OF ACTION
**(Cost Recovery Under CERCLA § 107(a) – Declaratory Judgment for Arranger Liability)**

158.    The County repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

159.    Under CERCLA § 107(a)(3), 42 U.S.C.  § 9607(a)(3), persons who arranged for disposal or treatment of hazardous substances at a facility are liable for necessary costs of responding to a release or threatened release of hazardous substances incurred by any other person consistent with the NCP.

160.    The Airport Property is a site within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

161.    Constituents found in the soil, sediment and groundwater at the Airport Property, including but not limited to the Hazardous Substances are "hazardous substances" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

162.    The Hazardous Substances have been disposed of and released into the environment within the meaning of CERCLA §§ 101(14) & (22), 42 U.S.C. §§ (14) & (22) since at least 1970.

163.    The County has undertaken, and will continue to undertake, investigations and a response action in connection with the Airport Property in response to releases or threatened releases of hazardous substances, and have incurred and will continue to incur necessary costs of response consistent with the NCP.

164.    The United States is liable for response costs incurred by the County for response, removal, remediation and cleanup under CERCLA § 107(a)(3), 42 U.S.C. §§ 9607(a)(3), 9620(a)(4) because it was a person who "arranged for disposal or treatment" of the Hazardous Substances at the Airport Property.

165.    An actual controversy exists under 28 U.S.C. § 2201 among the parties stemming from the cost of remediating the Airport Property and the United States' refusal to do so.

166.    The County is therefore entitled to a declaratory judgment that the United States is liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

**FIFTH CAUSE OF ACTION**
**(Cost Recovery Under CERCLA § 107(a) – Declaratory Judgment for Transporter Liability)**

167.    The County repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

168.    Under CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4), transporters who selected disposal or treatment sites are liable for necessary costs of responding to a release or threatened release of hazardous substances incurred by any other person consistent with the NCP.

169.    The Airport Property is a site within the meaning of CERCLA § 101(9), 42

U.S.C. § 9601(9).

170.     Constituents found in the soil, sediment and groundwater at the Airport Property, including the Hazardous Substances, are "hazardous substances" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

171.     The Hazardous Substances have been disposed of and released into the environment within the meaning of CERCLA §§ 101(14) & (22), 42 U.S.C. §§ (14) & (22) since at least 1970.

172.     The County has undertaken, and will continue to undertake,  investigations and a response action in connection with the Airport Property in response to releases or threatened releases of hazardous substances, and has incurred and will continue to incur necessary costs of response consistent with the NCP.

173.     The United States is liable for response costs incurred by the County for cleanup under CERCLA § 107(a)(4), 42 U.S.C. §§ 9607(a)(4), 9620(a)(4) because it was a person who "transported or who selected disposal or treatment sites" for the disposal of the Hazardous Substances from the Airport Property.

174.     An actual controversy exists under 28 U.S.C. § 2201 stemming from the cost of remediating the Airport Property and the defendants' refusal to do so.

175.     The County is therefore entitled to a declaratory judgment that the United States is liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

## SIXTH CAUSE OF ACTION
### (Money Judgment for Past Response Costs)

176.     The County repeats and realleges the allegations in the preceding paragraphs as

though fully set forth herein.

177.    The County has incurred response costs consistent with the NCP in connection with the Airport Property.

178.    Response costs incurred by the County include the costs of investigation, environmental sampling and analysis, and coordinating with the EPA and state environmental authorities.

179.    The United States is liable to the County for all such costs pursuant to CERCLA § 107, 42 U.S.C. § 9607.

## SEVENTH CAUSE OF ACTION
### (Violation of New York Environmental Conservation Law)

180.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

181.    Pursuant to ECL § 37-0107, "no person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or the environment in contravention of rules and regulations promulgated pursuant hereto.

182.    The United States, through its actions as described above, has stored or released the Hazardous Substances into the environment, including but not limited to the Base, the Airport Property, the County Water Sources and the Affected Property.

183.    The Hazardous Substances are hazardous or acutely hazardous to public health, safety or the environment.

184.    The United States' actions are in contravention of the ECL.

185.    As a proximate result of the actions of the United States, the County has incurred and will continue to incur damages, including cleanup and remediation costs.

186.    Accordingly, the United States is liable to the County for its damages proximately

caused by such actions, including damages to the Airport Property and County Water Sources, and is responsible for investigation, cleanup, and removal of the contamination.

### EIGHTH CAUSE OF ACTION
**(Negligence)**

187.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

188.    The United States owed and still owes a duty to the County to properly and carefully handle the Hazardous Substances, and not to permit or allow Hazardous Substances to contaminate the Airport Property or County Water Sources.

189.    The United States also owed and still owes a duty to the County to promptly and responsibly respond to known releases of contaminants in a manner which would prevent exposure, and otherwise protect the County and its residents from contamination and resulting impacts.

190.    The United States acted unreasonably and negligently and breached those duties by its negligent and reckless acts and omissions in owning, operating, maintaining, and controlling the Base, by the improper release and disposal of the Hazardous Substances, by the failure to properly handle, dispose of, contain and abate the Hazardous Substances at, and released from, the Base, and by its failure to promptly and effectively investigate and address the contamination.

191.    The United States also breached its duty to timely warn the County of the risk of the contamination in the County Water Sources and the risk of harm due to the presence of the contamination.

192.    The United States had knowledge of the dangers of the Hazardous Substances since at least 2001 and failed to timely notify or take any action until at least 2016.

193.    These breaches of duties to the County are continuing and have proximately caused substantial injury and damage to the County, including, but not limited to, injury in the form of damages to the Airport Property, the surrounding vicinity and the County Water Sources, all due to the actual presence of the contamination.

194.    As a result of these breaches, the County is required to undertake additional, extensive monitoring and potential treatment of the drinking water provided to its residents pursuant to New York State law, incurring significant costs well into the future.

195.    Accordingly, the United States is liable to the County for its damages proximately caused by such negligence and recklessness, including damages to the Airport Property and County Water Sources, and responsible for investigation, cleanup, and removal of the contamination.

196.    Further, this Court should issue an injunction requiring the United States to immediately investigate, remove all sources of Hazardous Substances, and remediate the Airport Property, County Water Sources and surrounding vicinity.

197.    The damage done to the County Water Sources requires remedial action to eliminate the damage.

198.    The United States should control and protect the County Water Sources from the contamination through implementation of a watershed protection or similar plan to protect the County's Water Sources, immediate abatement of the nuisances, and remediation of the County Water Sources.

199.    If the United States fails to exercise its duty to control and prevent the contamination from further entering the County Water Sources, the remediation will be ineffective.

## NINTH CAUSE OF ACTION
### (Inverse Condemnation)

200.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

201.    The United States contaminated water flowing into the County Water Sources, which was a physical and/or regulatory taking of the County's property rights, amounting to exercise of dominion and control.

202.    The intrusion by the United States into the County Water Sources interfered with the County's property rights to the water in the County Water Sources to such a degree that this conduct amounted to an unconstitutional taking.

203.    The United States, by reason of this intrusion, interference and taking, is liable for all of the damages to the County arising from the inverse condemnation and *de facto* taking.

## TENTH CAUSE OF ACTION
### (Abnormally Dangerous Activity)

204.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

205.    Use, storage and disposal of Hazardous Substances and leaving them in an unremediated, unmonitored, unreported and unsecured condition, is an abnormally dangerous activity.

206.    The United States, including its officers, agents, servants and/or employees, engaged in abnormally dangerous activities by the manner in which it used, stored and disposed of Hazardous Substances at the Base, which: (a) created a high degree of risk of harm to others, and particularly to the County, whose property has been adversely affected by the contamination; (b) created a risk involving a likelihood that the harm threatened by the activities of defendants

would be great; (c) created a risk of harm that could not be eliminated by reasonable care; (d) were not a matter of common usage; (e) were inappropriate to the place that they were being carried on, in that they were not contained, but were allowed to flow into the source of water for the County's residents, which imposed an unusual and extraordinary risk of harm to the County and its residents.

207.    The risks posed by the United States' conduct at the Base are such as give rise to an absolute duty to the County.

208.    As a direct and proximate result of the conduct of the United States' in engaging in the abnormally dangerous activities alleged above, Hazardous Substances generated and stored at the Base have and continue to exist under and around the Airport Property and Base, resulting in the contamination of surface water and groundwater, including the County Water Sources.

209.    The harm sustained by the County is exactly the kind of harm posed by the United States, the possibility of which made the activities of the United States abnormally dangerous.

210.    By reason of these abnormally dangerous activities, United States is liable to the County for its damages proximately caused by such negligence and recklessness, including damages to the County Water Sources and responsible for investigation, cleanup and removal of the contamination.

211.    Further, this Court should issue an injunction requiring the United States to immediately investigate and remediate the Affected Property.

## ELEVENTH CAUSE OF ACTION
### (Public Nuisance)

212.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

213.    The United States, by causing the contamination, has interfered with the rights common to all, including groundwater, surface waters including the County Water Sources, and public lands.

214.    The County, as a property owner of the Airport Property and County Water Sources, has sustained special damages from this public nuisance.

215.    Accordingly, the United States is liable to the County for its damages proximately caused by such public nuisance, including damages to the County Water Sources, and are responsible for investigation, cleanup and removal of the contamination.

216.    Further, this Court should issue an injunction requiring the United States to immediately halt all disposals, investigate and remove sources of contamination and remediate the Affected Property.

## TWELFTH CAUSE OF ACTION
### (Trespass)

217.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

218.    The United States, by its intentional acts and omissions and/or the intentional acts and omissions of their officers, agents, and/or employees, caused the contamination to flow from the Base to the County Water Sources.

219.    The contamination was the inevitable result of those intentional acts and omissions.

220.    The United States, by its acts and omissions, or the acts or omissions of its agents, employees or predecessors, have interfered with the rights of the County to exclusive possession of the Affected Property and County Water Sources and threaten to do so in the future.

221.    Accordingly, the United States is liable, by reason of this trespass, to the County

for its damages proximately caused by such trespass, including damages to the County Water Sources, and responsible for investigation, cleanup and removal of the contamination.

222.    Further, this Court should issue an injunction requiring the United States to immediately investigate and remediate the Affected Property.

## THIRTEENTH CAUSE OF ACTION
### (Equitable or Implied Indemnification)

223.    The County repeats and realleges the allegations in the prior paragraphs as though fully set forth herein.

224.    The United States, including its officers, agents, servants, employees, and/or lessees, had a non-delegable duty to the County and the public to prevent, clean up, or ensure against the contamination of the Airport Property and to prevent the discharge of the Hazardous Substances into the County Water Sources.

225.    As a result of the breach of this duty by the United States, including its officers, agents, servants, employees and/or lessees, the United States is responsible for the County's expenses and damages in investigation, remediation, cleanup, and removal of, and response to the contamination.

226.    The United States should, in equity, indemnify the County for its expenses, costs and damages.

## FOURTEENTH CAUSE OF ACTION
### (Restitution)

227.    The County repeats and realleges the allegations in the preceding paragraphs as though fully set forth herein.

228.    It would be against equity and good conscience to permit the United States to pass the burden of cleaning up the contamination to the County, and to have had the benefit of

enjoyment of the use of, or work on, the Airport Property, free of any responsibility for investigation, remediation, cleanup and removal of, and response to, the contamination.

229. Therefore, the United States should make restitution to the County for all of its expenses, costs and damages, including attorneys' fees and costs incurred in defending itself in the Affected Persons Actions.

**WHEREFORE**, the County prays for relief against the United States, awarding it a judgment as follows:

a. On the First Cause of Action, issuing an injunction, pursuant to 42 U.S.C. § 6972(a), requiring that the United States immediately investigate and remediate the Affected Property; set treatment standards to the lowest detectable levels for PFAS; halt all use of PFAS on the Airport Property and install a GAC or other treatment or response system to filter the County Water Sources; and pay for all costs related to the continued use of alternative water supplies until the PFAS removal is completed, and for operation and maintenance of a GAC or other treatment or responses system in perpetuity until the remediation of the Affected Property occurs and is completed, and awarding the County the costs of its continued monitoring or oversight of the Affected Property and County Water Sources, and the costs of this litigation, including reasonable attorney and expert witness fees, pursuant to 42 U.S.C. § 6972(e).

b. On the Second Cause of Action, issuing an injunction, pursuant to 33 U.S.C. § 1365(a), requiring the United States to discontinue discharges of the Hazardous Substances in violation of the CWA, and to immediately investigate and remediate the sediment and waters of the County Water Sources, and awarding the County the costs of its continued monitoring or oversight of the Affected Property and County Water Sources, and the costs of this litigation, including reasonable attorneys' and expert witness fees, pursuant to 33 U.S.C. §

1365(d).

c.       On the Third Cause of Action, declaring that the United States is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a), for all response costs actually incurred by the County with respect to the Affected Property and that the United States is liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

d.       On the Fourth Cause of Action, declaring that the United States is liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).

e.       On the Fifth Cause of Action, declaring that the United States is liable for necessary future costs of investigation and cleanup consistent with the NCP in subsequent actions for further response costs, pursuant to).

f.       On the Sixth Cause of Action, awarding the County responses costs incurred under CERCLA § 107(a) in such an amount to be determined at trial.

g.       On the Seventh Cause of Action, awarding the County costs incurred pursuant to ECL § 37-0107 in an amount to be determined at trial.

h.       On the Eighth Cause of Action, issuing an order requiring the United States to immediately investigate, remove all sources of Hazardous Substances, and remediate the Airport Property, County Water Sources and surrounding vicinity, and awarding compensatory damages in an amount to be determined at trial.

i.       On the Ninth Cause of Action, awarding compensatory damages in an amount to be determined at trial.

j.       On the Tenth Cause of Action, issuing an injunction requiring the United

States to immediately investigate and remediate the Affected Property, and awarding compensatory damages in an amount to be determined at trial.

k.      On the Eleventh Cause of Action, issuing an injunction requiring the United States to immediately halt all disposals, investigate and remove sources of contamination and remediate the Affected Property, and awarding compensatory damages in an amount to be determined at trial.

l.      On the Twelfth Cause of Action, issuing an injunction requiring the United States to immediately investigate and remediate the Affected Property, and awarding compensatory damages in an amount to be determined at trial.

m.      On the Thirteenth Cause of Action, awarding the County the expenses and damages in investigation, remediation, cleanup, and removal of, and response to the contamination, and declaring that United States are required to indemnify the County for its expenses, costs and damages.

n.      On the Fourteenth Cause of Action, awarding restitution to the County for all of its expenses, costs and damages, including attorneys' fees and costs incurred in defending itself in the Affected Persons Actions.

Dated: Garden City, New York
      February 14, 2019

Stagg, Terenzi, Confusione & Wabnik, LLP

By:  /s/ Thomas E Stagg
      Thomas E. Stagg
      Andrew Kazin
      Brian A. Lacoff
      *Attorneys for Plaintiff County of Suffolk*
      401 Franklin Avenue, Suite 300
      Garden City, New York 11530
      (516) 812-4500